J-S38027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZAMIR BURTON | : | |
| | : | |
| Appellant | : | No. 3341 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002582-2021

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZAMIR BURTON | : | |
| | : | |
| Appellant | : | No. 3342 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002607-2021

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZAMIR BURTON | : | |
| | : | |
| Appellant | : | No. 3343 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002611-2021

BEFORE: McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED NOVEMBER 26, 2025**

Appellant, Zamir Burton, appeals *nunc pro tunc* from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for the following offenses: at docket No. 2611, third-degree murder and possessing an instrument of crime ("PIC"); at docket No. 2582, attempted murder, aggravated assault, conspiracy to commit murder, unlawful restraint—serious bodily injury, and PIC; at docket No. 2607, abuse of a corpse.[1]  We affirm.

The relevant facts and procedural history of this matter are as follows. In December 2019, 14-year-old I.J. ran away from home and went to live with Appellant—her boyfriend, who had recently experienced homelessness—in a home with Appellant's friends on Fairhill Street.  The other residents included Zahmir Mason, Lashawana Dantzler, and Jordan Oliver-Williams, as well as an older couple who owned the home, and Ms. Dantzler's minor children.  Ms. Dantzler had romantic relationships with both Mr. Mason and Mr. Oliver-Williams, and she was also talking to Darius Cheeseboro on Instagram.

On December 21, 2019, Mr. Mason told Ms. Dantzler to text Mr. Cheeseboro and tell him to come over.  When Mr. Cheeseboro arrived, Appellant, Mr. Mason, and Mr. Oliver-Williams attacked him.  Appellant and Mr. Oliver-Williams held down Mr. Cheeseboro while Mr. Mason stabbed him. The men dragged Mr. Cheeseboro into the kitchen and beat him with pots and

_____

[1] 18 Pa.C.S.A. §§ 2502(c), 907(a), 901(a) (section 2502 related), 2702(a), 903 (section 2502 related), 2902(a)(1), 907(a), and 5510, respectively.

pans. Mr. Cheeseboro attempted to flee at least once but was dragged back into the house and, eventually, incapacitated. The men then took Mr. Cheeseboro's body to the backyard, mutilated his genitalia, and burned him.

I.J. was upstairs with Ms. Dantzler's children during the assault and heard thumping noises, a male voice screaming, "stop," and "please, let me go," and pots and pans smashing. (*See* N.T. Trial, 9/19/23, at 111-12). When the noise stopped, Ms. Dantzler and Mr. Mason came upstairs to I.J.'s room, and Appellant and Mr. Oliver-Williams followed. Mr. Mason opened a shirt that contained a severed penis and showed it to I.J. Ms. Dantzler told I.J. to go downstairs and help clean up. Downstairs, I.J. saw blood everywhere on the carpet, in the kitchen, and on the steps. I.J. then helped Appellant and the rest of the group clean up the blood. At this time, I.J. learned that Mr. Cheeseboro's body was in the backyard. One of the men shoved Mr. Cheeseboro's body into a trashcan, and the group directed I.J. to act as a lookout while they took the trashcan to a nearby bridge and tossed it over the edge.

On December 22, 2019, I.J. returned to the bridge with Ms. Dantzler, who felt bad about what had happened to Mr. Cheeseboro, with whom she had previously had a good relationship. Mr. Mason and Appellant also returned to the bridge, where they placed a table over the trashcan to cover it.

On December 26, 2019, I.J. overheard Ms. Dantzler mention that someone kept texting her phone. It was Marquise Swinton-Carpenter, a man

Ms. Dantzler had met through Instagram and with whom she had previously had sexual relations. Ms. Dantzler claimed that Mr. Swinton-Carpenter had filmed their sexual encounter and posted it on Instagram and that she wanted him to be beaten up. That night, Mr. Mason told Ms. Dantzler to "invite the dude over." (*See id.* at 119-20). Ms. Dantzler subsequently invited Mr. Swinton-Carpenter to the house to smoke marijuana. I.J. also heard Ms. Dantzler tell Mr. Mason that she would play a song as a cue for the rest of the group to come downstairs.

When Mr. Swinton-Carpenter arrived at the home, I.J. opened the door for him and they both sat on the couch. Ms. Dantzler came downstairs and talked to him for a short time before playing the song. Mr. Mason came downstairs, shook Mr. Swinton-Carpenter's hand, and went into the kitchen. Ms. Dantzler, Mr. Oliver-Williams, and Appellant also shook Mr. Swinton-Carpenter's hand.

When Mr. Mason returned from the kitchen, he was holding a knife, and slashed Mr. Swinton-Carpenter's throat. After the initial cut, Mr. Mason began stabbing Mr. Swinton-Carpenter and attempting to sever his head. Meanwhile, Ms. Dantzler beat Mr. Swinton-Carpenter with a bat, and Mr. Oliver-Williams held him down, beat him, and strangled him. Mr. Oliver-Williams also began to beat Mr. Swinton-Carpenter with the bat. Appellant participated in the beating and stabbing as well.

Ms. Dantzler told the others, "Don't let him go because he [would] rat." (*Id.* at 121-22). I.J. retreated up the stairs, recording the attack on her

- 4 -

phone. Mr. Swinton-Carpenter lost consciousness during this ordeal several times, and at one point awoke to find that his pants had been pulled down and flames lit near his private parts. Mr. Swinton-Carpenter managed to put out the flames before losing consciousness again. One of the men threw Mr. Swinton-Carpenter into the backyard, and Ms. Dantzler came upstairs to tell I.J. that she needed to help clean up. Once again, I.J. went downstairs to help them clean because she was afraid if she did not, she would be killed.

Mr. Swinton-Carpenter woke up in the backyard. His throat had been cut, he had been stabbed and cut numerous times, and his right hand had almost been cut off. Notwithstanding his severe injuries, Mr. Swinton-Carpenter was able to flee and seek help.

The group heard the noise of a fence, and when Appellant and Mr. Mason went out back to check on Mr. Swinton-Carpenter, they discovered that he had escaped. The group left the house and began looking for him. Mr. Swinton-Carpenter ran to the nearest bystander and collapsed. Mr. Swinton-Carpenter saw his assailants on the street, but when they noticed that he was with a bystander who had called the police, the men did not approach. Police officers responded to reports of a stabbing and brought Mr. Swinton-Carpenter to a nearby hospital for treatment for his severe wounds, which included a slash that exposed his trachea, wounds to his head, eyes, and eyebrows, lacerations to his chest, hip, groin, and buttocks, and a severe laceration of his wrist, which exposed tendons and a lacerated artery. Mr. Swinton-Carpenter was intubated and taken into surgery. He survived but spent

several days in the hospital and many weeks in physical therapy.

Mr. Mason, Ms. Dantzler, and Mr. Oliver-Williams were angry with Appellant, who was supposed to have been acting as a lookout, and told him to leave the house. Terrified, I.J. packed her things and left the house with Appellant. I.J. and Appellant went to stay with his grandmother and then with his father. Ultimately, I.J. reported the attacks to her school counselor, who then called the police.

On January 14, 2020, police officers interviewed I.J. about the attacks.[2] I.J. stated that she could take the officers to the house where the murder had occurred and to the body. Officers took I.J. to the Fairhill Street house and to a nearby bridge on Rockland Street, where she pointed to indicate the location of the body. Looking down from the bridge, officers could see a black trashcan covered by a white table. They radioed for supervisors, who went beneath the bridge and discovered a body crumpled and shoved in the trashcan. Other officers processed the crime scene and recovered the body of the victim, who was later identified as Mr. Cheeseboro. Officers also processed the scene at the house on Fairhill Street. I.J. gave officers her phone, and extractions were made to examine the contents.

Dr. Lindsay Simon performed an autopsy on Mr. Cheeseboro. She determined that his cause of death was multiple stab and incised wounds, and

---

[2] Initially, I.J. did not mention Appellant's involvement in the attacks because she was still in a relationship with him and did not want to get him in trouble. However, she later told police about Appellant's involvement.

his manner of death was homicide. Mr. Cheeseboro had suffered, in total, 6 stab wounds to his stomach, and 24 assorted incised wounds or cuts on his scalp, genitalia, leg, head, and neck, as well as less serious cuts across most areas of his body. Mr. Cheeseboro had also been strangled, his body had been partially burned, and his genitalia had been mutilated and partially amputated.

Police arrested Appellant and his cohorts, and the Commonwealth charged them with a litany of crimes. Ms. Dantzler, Mr. Mason, and Mr. Oliver-Williams all chose to enter guilty pleas to various crimes. On September 18, 2023, Appellant proceeded to trial by jury. The jury convicted Appellant on September 21, 2023, of the above-mentioned crimes.

On November 20, 2023, the matter proceeded to sentencing. At sentencing, Appellant's counsel emphasized the psychological forensic evaluation that Appellant had undergone, which diagnosed him with major depressive disorder, attention deficit hyperactivity disorder, and marijuana abuse dependency. Counsel also argued that Appellant had been abandoned by his mother at a young age, and then again rejected by her when he left his father's home following a disagreement. Appellant requested a sentence that would help him become a law-abiding citizen if he was ever eligible for parole.

At docket No. 2611, the court sentenced Appellant to 20 to 40 years of incarceration for third-degree murder and 2½ to 5 years' imprisonment for PIC (related to Mr. Cheeseboro). At docket No. 2607, the court sentenced Appellant to 1 to 2 years' imprisonment for abuse of a corpse (related to Mr. Cheeseboro). At docket No. 2582, the court sentenced Appellant to 20 to 40

years of incarceration for attempted murder, 2½ to 5 years of incarceration for unlawful restraint, and 2½ to 5 years of incarceration for PIC (related to Mr. Swinton-Carpenter). The remaining convictions at this docket merged for sentencing purposes. The court imposed the sentences consecutively for an aggregate term of 48½ to 97 years of incarceration, the maximum possible sentence.

On November 28, 2023, Appellant timely filed a post-sentence motion, arguing that the sentence was in the aggravated range and did not appropriately consider Appellant's mitigating factors. The court denied the motion on March 25, 2024. Appellant did not file a direct appeal.

On September 19, 2024, Appellant filed a petition pursuant to the Post-Conviction Relief Act ("PCRA")[3] seeking restoration of his direct appeal rights *nunc pro tunc*. On October 4, 2024, Appellant filed a counseled amended petition. On November 15, 2024, the court reinstated Appellant's direct appeal rights *nunc pro tunc*. On November 26, 2024, the court entered an additional order expressly granting Appellant's petition.

On December 15, 2024, Appellant timely filed separate notices of appeal *nunc pro tunc* at each docket.[4] On December 23, 2024, Appellant filed an amended notice of appeal at docket No. 2611. On January 7, 2025, the court

_____

[3] 42 Pa.C.S.A. §§ 9541-9546.

[4] The certified docket entries state that the appeal at docket No. 2607 was not filed until December 24, 2024, but the notice of appeal is time stamped December 15, 2024.

- 8 -

ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On February 4, 2025, Appellant timely complied and filed Rule 1925(b) statements at each separate docket. On April 29, 2025, this Court consolidated the appeals *sua sponte*.

On appeal, Appellant raises the following issue for our review:

> Whether the [trial] court abused its discretion in imposing [an] aggravated maximum cumulative sentence of [48½ to 97] years, consisting of twenty (20) to forty (40) years for third Degree Murder and two and one-half (2½) years to five (5) years for [PIC] in the case docketed at CP-51-CR-0002611-2021, twenty (20) years to forty (40) years for Attempted Murder and two and one-half (2½) to five (5) years for [PIC and unlawful restraint at docket No. 2582 and] (1) year to two (2) years' incarceration for Abuse of Corpse, in [the] case docketed at CP-51-CR-0002607-2021, where Appellant has no history of violence, and was [a] true zero [prior record score], the most serious offenses of Third Degree Murder and Attempted Murder yielded a standard sentencing range of ninety (90) months to the statutory limit, plus or minus twelve (12) months, Appellant's abandonment by his mother as a young child caused him to suffer depression, anxiety, post traumatic disorder and disruptive mood dysregulation disorder, overwhelming mental disabilities which could not be overcome by the best efforts of his father, who raised Appellant in a single parent home, and Appellant was homeless at the time of the incident, which rendered him emotionally and psychologically vulnerable to manipulation by the principals of the criminal enterprise?

(Appellant's Brief at 5).

Appellant argues that the imposition of the maximum sentence was excessive, where he had a prior record score of zero and the standard sentencing range for the most serious offenses was 90 months' imprisonment to the statutory limit, plus or minus 12 months. Appellant asserts that the

court failed to appropriately consider mitigating factors such as his abandonment by his mother and other mental health issues, as well as the fact that his homelessness at the time of the incident rendered him vulnerable to manipulation by his co-defendants. Appellant concludes that the court abused its sentencing discretion, and that this Court must vacate and remand for re-sentencing. We disagree.

As presented, Appellant's issue challenges the discretionary aspects of his sentence. *See Commonwealth v. Austin*, 66 A.3d 798, 808 (Pa.Super. 2013), *appeal denied*, 621 Pa. 692, 77 A.3d 1258 (2013) (considering challenge to imposition of consecutive sentences as claim involving discretionary aspects of sentencing); *Commonwealth v. Lutes*, 793 A.2d 949 (Pa.Super. 2002) (stating claim that sentence is manifestly excessive challenges discretionary aspects of sentencing); *Commonwealth v. Cruz-Centeno*, 668 A.2d 536 (Pa.Super. 1995), *appeal denied*, 544 Pa. 653, 676 A.2d 1195 (1996) (explaining claim that court did not consider mitigating factors challenges discretionary aspects of sentencing). Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. *Commonwealth v. Sierra*, 752 A.2d 910 (Pa.Super. 2000). Prior to reaching the merits of a discretionary sentencing issue:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether

there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa.Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted).

When appealing the discretionary aspects of a sentence, an appellant must invoke this Court's jurisdiction by including in his brief a separate concise statement demonstrating a substantial question as to the appropriateness of the sentence under the Sentencing Code. **Commonwealth v. Mouzon**, 571 Pa. 419, 812 A.2d 617 (2002); Pa.R.A.P. 2119(f). "The requirement that an appellant separately set forth the reasons relied upon for allowance of appeal furthers the purpose evident in the Sentencing Code as a whole of limiting any challenges to the trial court's evaluation of the multitude of factors impinging on the sentencing decision to **exceptional** cases." **Commonwealth v. Phillips**, 946 A.2d 103, 112 (Pa.Super. 2008), *cert. denied*, 556 U.S. 1264, 129 S.Ct. 2450, 174 L.Ed.2d 240 (2009) (quoting **Commonwealth v. Williams**, 562 A.2d 1385, 1387 (Pa.Super. 1989) (*en banc*)) (emphasis in original) (internal quotation marks omitted).

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." **Commonwealth v. Anderson**, 830 A.2d 1013, 1018 (Pa.Super. 2003). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing

process." ***Sierra, supra*** at 912-13.

> Pennsylvania law affords the sentencing court discretion to impose [a] sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed. Any challenge to the exercise of this discretion does not raise a substantial question. In fact, this Court has recognized the imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment.

***Austin, supra*** at 808 (internal citations and quotation marks omitted). Nevertheless, a claim of excessiveness can raise a substantial question as to the appropriateness of a sentence under the Sentencing Code, even if the sentence is within the statutory limits. ***Mouzon, supra*** at 430, 812 A.2d at 624. Bald allegations of excessiveness, however, do not raise a substantial question to warrant appellate review. ***Id.*** at 435, 812 A.2d at 627.

Further, "this Court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." ***Commonwealth v. Disalvo***, 70 A.3d 900, 903 (Pa.Super. 2013) (internal citation omitted). ***See also Commonwealth v. Griffin***, 804 A.2d 1, 9 (Pa.Super. 2002), *cert. denied*, 545 U.S. 1148, 125 S. Ct. 2984, 162 L.Ed.2d 902 (2005) (noting that allegation that sentencing court did not consider evidence of good behavior in prison, alleged brain damage, and limited mental capacity does not raise a substantial question). Nevertheless, an excessive sentence claim **in conjunction** with a claim that the sentencing court failed to consider certain mitigating factors raises a

substantial question. ***Commonwealth v. Caldwell***, 117 A.3d 763, 769-70 (Pa.Super. 2015).

Instantly, Appellant timely filed notices of appeal *nunc pro tunc* at each underlying docket and preserved his sentencing challenge in a timely post-sentence motion and Rule 2119(f) statement. Further, his excessiveness claim coupled with his complaint that the court failed to consider mitigating factors arguably raises a substantial question for our review. ***See id.*** Accordingly, we consider the merits of his sentencing issue.

This Court reviews discretionary sentencing challenges based on the following standard:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, bias or ill-will.

***Commonwealth v. McNabb***, 819 A.2d 54, 55 (Pa.Super. 2003) (quoting ***Commonwealth v. Hess***, 745 A.2d 29, 30-31 (Pa.Super. 2000)).

Pursuant to Section 9721(b), "the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). Additionally, "a court is required to consider the particular circumstances of the offense and the

- 13 -

character of the defendant." ***Griffin, supra*** at 10. "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." ***Id.***

> ... Where the sentencing court had the benefit of a [pre-sentence investigation ("PSI") report], we can assume the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Devers***, 519 Pa. 88, 101-02, 546 A.2d 12, 18 (1988). ***See also Commonwealth v. Tirado***, 870 A.2d 362, 368 (Pa.Super. 2005) (stating if sentencing court has benefit of PSI, law expects court was aware of relevant information regarding defendant's character and weighed those considerations along with any mitigating factors).

***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa.Super. 2010).

Instantly, the trial court explained its sentence as follows:

> This [c]ourt has considered the [PSI] report, the sentencing guidelines, all of the attachments, the December 13, 2021, report of Eliot Atkins submitted on behalf of [Appellant].
>
> I've also considered the arguments of both counsel. I've considered [Appellant's] statements on allocution. This [c]ourt has also considered the particular circumstances of this offense.
>
> This [c]ourt recognizes a number of mitigating factors that include but are not limited to [Appellant's] repeated abandonment by his mother, the fact that he was receiving [psychological] treatment since he was three years old. He has a history of depression and anxiety; that he's been diagnosed with PTSD, *et cetera*.
>
> This [c]ourt also observes that in the early years, [Appellant] performed well in school. And unfortunately, this was offset by his aggressive or antagonistic behavior throughout the years, which culminated in him dropping out of school with nearly all failing grades by the 12th grade.

This [c]ourt also finds as atypical that he did participate in Job Corps at some point I think when he was 15, and that he was enrolled in charter schools during his early education.

So clearly, there was an effort from his father, at least, to keep him from the streets, but his demons prevailed. And though he may not have come up in the streets, he certainly committed offenses that more than qualify him to thrive in violent circumstances.

The aggravating circumstances can be characterized in so many different ways. I do agree with the Commonwealth that these two incidents constituted torture. That's no exaggeration. And it culminated in one death and one survivor.

It's difficult to conceive what a person could possibly be thinking or feeling while doing things like that to someone else.

The video clips were all jarring. One of the worst ones was watching one of the two victims—I believe it was the first one—trying to escape and he was pulled back into the house. And I believe it was [by Appellant].

Whether or not it was, we have ample testimony corroborating the jury's verdict that [Appellant] fully participated in both [incidents].

I also think it's worth emphasizing in agreement with the Commonwealth that one such act is difficult to wrap one's head around, but the fact that they decided to do it again just five days later, inconceivable.

The depravity of heart that [Appellant] and his cohorts demonstrate is disturbing. And hopefully, it will be the worst that this [c]ourt will ever have to hear. That's how bad it is.

This [c]ourt finds specifically that [Appellant] poses a grave threat to the citizens of the city and to humanity.

> So the following sentence is both appropriate and necessary to safeguard society from this kind of conduct and to reflect the impact on the victims.
>
> Any interest in the possibility of rehabilitation is far outweighed by these two interests.

(N.T. Sentencing, 11/20/23, at 23-26).

The record reflects that the court had the benefit of a PSI report and considered the mitigating factors therein. Thus, the record belies Appellant's claim that the court failed to consider relevant mitigating factors, which would include Appellant's abandonment, homelessness, and other mental health concerns. ***See Moury, supra***. Further, we cannot say that the court erred or abused its broad sentencing discretion by imposing the maximum consecutive sentence despite the mitigating factors in this case and the standard range guidelines. As the court properly observed, the cruelty, depravity, and violence of the crimes warranted a maximum sentence to protect the public and to reflect the grave impact that these horrific crimes had on the victims and their families, both living and deceased. On this record, we see no reason to disrupt the court's sentencing discretion. ***See McNabb, supra***. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/26/2025

- 16 -